IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2025

## STATE OF TENNESSEE v. NATHANIEL LEE MITCHELL

**Appeal from the Circuit Court for Giles County**
**No. 16411     M. Caleb Bayless, Judge**

_____

### No. M2024-01039-CCA-R3-CD

_____

Defendant, Nathaniel Lee Mitchell, appeals from his Giles County Circuit Court conviction for reckless endangerment with a deadly weapon, for which he received a sentence of two years, suspended to two years' supervised probation. Defendant contends that the trial court erroneously admitted evidence of a prior incident in violation of Tennessee Rule of Evidence 404(b) and that the evidence of his reckless mental state was insufficient. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and KYLE A. HIXSON, J., joined.

Raven Prean-Morris, Assistant Public Defender—Appellate Division; Travis B. Jones, District Public Defender; and Robert H. Stovall, Jr., and Teresa Campbell, Assistant District Public Defenders, for the appellant, Nathaniel Lee Mitchell.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Rebecca S. Parsons and Hunter Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

This case arises from the March 10, 2022 accidental shooting death of Defendant's three-year-old son ("the victim"). The September 2022 term of the Giles County Grand

Jury issued an indictment charging Defendant with reckless homicide and criminally negligent homicide.[1]  *See* Tenn. Code Ann. §§ 39-13-212, -215.

Defendant subsequently filed a pretrial motion to exclude evidence under Tennessee Rule of Evidence 404(b).  Relevant to this appeal, Defendant sought to exclude evidence concerning an incident occurring in December 2021, about two months prior to the shooting, in which "Defendant was warned about shooting a gun in the city limits of Elkton in what the [S]tate contends was a reckless manner."  Defendant noted that he had not been cited or arrested in connection with the prior incident, and he argued that the incident was irrelevant, too similar to the offense for which he was being tried, and showed a propensity to violate the law.

*A.      404(b) hearing*

After jury selection but before the State opened its proof, the trial court held a jury-out hearing relative to Defendant's motions to exclude prior acts evidence.  The State described the December 2021 incident, as follows:

> This is an incident where . . . dispatch received a phone call from a neighboring business that can be seen in some of the pictures that the State intends to introduce in its case today.  That business was reporting that somebody on [Defendant]'s property was shooting a gun on the tree line that fell between the business and the house and that the shot was coming towards the business . . . .  [Defendant] did tell [the responding officers] he was shooting in the door in that direction.  They advised him that was a reckless act with a gun and that he cannot do that.  Both of those go to knowledge and awareness of reckless conduct as it pertains particularly to what should have been in [Defendant]'s mind on the day this occurred.

Giles County Sheriff's Office ("GCSO") Deputy Christian Rock testified that, in December 2021, he and another officer responded to "a call for service at a business in Elkton in reference to someone discharging a firearm in the direction of the business."  Deputy Rock stated that they visited the business, where a person walked outside and identified Defendant's house as the source of the shooting.  Deputy Rock stated that they also spoke to Defendant at his house.  When the officers told Defendant that a business had reported his firing a gun, Defendant responded that he had been shooting at a door propped up against a tree.  Deputy Rock identified a photograph of Defendant's yard, which showed the tree and the complaining business, which was located in a warehouse in the background.  Deputy Rock noted that Elkton Highway also ran between Defendant's

---

[1] The State entered a nolle prosequi as to the criminally negligent homicide count prior to trial.

property and the business. Deputy Rock stated that Defendant "said he felt he was shooting in a safe direction" and that Defendant expressed that the officers "didn't have any right to tell him he couldn't shoot." Deputy Rock testified that, after confirming that Defendant's property was inside the Elkton city limits, they advised him to check with the city for any ordinances governing discharging a firearm and warned that he could injure someone inside the business or driving on the road.

On cross-examination, Deputy Rock testified that Defendant was inside the house when he arrived and that he did not see Defendant's firing the gun. Deputy Rock stated that Defendant showed him the door, which had bullet holes consistent with a "small-caliber weapon." Deputy Rock denied seeing any damage to the business, and no one at the business claimed to be injured. He did not issue Defendant a citation or charge Defendant with a crime, although he gave Defendant a warning. Deputy Rock agreed that the conduct did not rise to the level of a crime. Deputy Rock did not file a police report in connection with the incident. He agreed that he would have charged Defendant if he had seen him acting recklessly.

Lawrenceburg Police Department Investigator Arthur Adams, III, testified that he previously worked for GCSO and that he responded to the December 2021 call with Deputy Rock. Investigator Adams testified consistently with Deputy Rock regarding the reason for the call and the business's location in relation to Defendant's yard. He said that Defendant told them that he had gotten a new pistol and was "trying it out." Investigator Adams stated that they spoke to Defendant about gun safety and that a gun needed to be fired at a range or "where there's not a main highway." On cross-examination, Investigator Adams denied writing a report about the incident; he agreed that it "wasn't a big enough deal for a report[.]"

The State argued that the incident would be offered to "show what's in [D]efendant's mind," specifically, that Defendant was "aware of and consciously disregard[ed] a substantial, unjustifiable risk." Defendant responded that the incident was irrelevant because the officers did not observe any reckless behavior.

The trial court made the following findings:

> . . . So the [c]ourt . . . must determine outside the presence of the jury if a material issue exists other than the conduct or character trait. The [c]ourt does find that [an] issue does exist outside the conduct conforming with a character trait. The [c]ourt must find the proof of other crime or act [to] be by clear and convincing evidence. Here each officer testified that [Defendant] claimed that he did shoot the weapon on that particular day.

- 3 -

The Court does not find the probative value of this is outweighed by the danger of unfair prejudice[,] [in] regards to [Defendant's] having shot a gun on this day and the officers having said something. However, the [c]ourt would exclude anything coming from the business, whether that be through dispatch that there was a weapon being fired in that particular area or anything once the officers talked to the business as that would be hearsay absent the fact of those individuals being here to testify, which the [c]ourt did not hear from them . . . . The [c]ourt will allow that [Defendant] was shooting a gun back in December of 2021 and any conversation related thereto that does not bring in the hearsay of parties in relation to that incident.

The State confirmed for the trial court that it did not intend to elicit that Defendant's conduct that day was reckless.

### B.    Trial

At trial, the State entered as exhibits a recording of a 911 call from March 10, 2022, and a corresponding dispatch report. The report reflected that the victim's mother, Chelsea Hicks,[2] called 911 at 10:25 a.m. Ms. Hicks was "screaming incoherently" but conveyed that Defendant had been trying to repair a 12-gauge shotgun when it went off and hit the victim in the head as he sat on the couch. Ms. Hicks said that the victim was deceased and that his face had been "shot off." Defendant, who also spoke to the dispatcher, stated that the victim was deceased and not breathing before saying that he "had to go." Ms. Hicks told the dispatcher that Defendant had driven away with the gun and that she was afraid he would kill himself.

Investigator Adams testified that, on March 10, 2022, he was the first police officer to arrive on scene. He stated that two EMS workers were attending to the victim in the yard and that Ms. Hicks was "distraught" and "hysterical." Investigator Adams stated that the victim, who was deceased, had been shot in the face and that his appearance was "mind scarring to say the least."

Investigator Adams testified that Ms. Hicks walked back to the house and that he asked her what happened. Ms. Hicks told him that Defendant was repairing a shotgun and that, when he went to walk out the door, the shotgun "went off." Defendant was not at the scene but returned after Ms. Hicks and deputies contacted him. Defendant told Investigator Adams that he threw the shotgun into a creek bank and that he could take him to it. Defendant gave Investigator Adams a 12-gauge shotgun magazine from his truck.

---

[2] Ms. Hicks later testified that she and Defendant married between the time of the shooting and the trial; she had not yet legally changed her surname when she testified.

- 4 -

Investigator Adams testified that he had previously spoken to Defendant about gun safety. He stated that, after a concerned citizen called the police in December 2021, he went to Defendant's house. Defendant told him that he had been test firing a new handgun in his yard, and Investigator Adams discussed going to a gun range or safer area to shoot. He noted that Defendant had been shooting "towards a major highway in Elkton" and that a passing vehicle could have been struck.

On cross-examination, Investigator Adams testified that Ms. Hicks and Defendant told him that the shooting was accidental and that the gun "just went off." Investigator Adams added that Defendant told him he would never do anything to hurt the victim. He agreed that Defendant and Ms. Hicks were cooperative. When asked whether any shells were recovered at the scene, Investigator Adams responded, "One physical round. I believe there was three total."

Relative to the December 2021 incident, Investigator Adams testified that Defendant had been shooting at a door leaned against a tree; he noted that he did not see Defendant's shooting or whether Defendant was shooting downward. He agreed that he did not see Defendant's engaging in reckless behavior and that he did not arrest Defendant or issue him a citation. He affirmed that he and Deputy Rock did not "see it [as] an important enough incident to make a report out of it."

Giles County EMS critical care paramedic Bronson Slater testified that he and his partner responded to the shooting call; they arrived at 10:31 a.m., five minutes after dispatch contacted them. When Mr. Slater arrived, he saw the victim lying on his back in the yard; he saw no signs of life. He stated that the victim's nose was intact "but it was split" and that below the nose to the trachea was "completely opened up." Mr. Slater noted that it was one of the worst injuries he had seen in his career. Mr. Slater did not see anyone present other than the victim and Ms. Hicks.

Mr. Slater testified that Ms. Hicks was beside the victim's body and "was screaming saying, 'Somebody help my child.'" Ms. Hicks also stated that the victim was dead. Mr. Slater determined that the victim was not breathing and had no pulse, and an EKG machine showed no electrical activity in the heart. Ms. Hicks told Mr. Slater that Defendant was trying to repair his 12-gauge shotgun inside the house and that she was in the bathroom when she heard the shotgun go off. Ms. Hicks reported that the victim had been sitting in a chair in the house at the time. On cross-examination, Mr. Slater read from his report, "The [victim's mother] also stated the firearm accidentally discharged which had been messed up. He was trying to fix the broken part."

Giles County EMS supervisor and medical investigator Andrew Laxson testified that he also responded to the scene. Mr. Laxson went to the yard and saw the victim, who had a "large gunshot wound to the lower face and neck and upper chest." He stated that

the victim was about three feet tall and weighed about thirty pounds. Mr. Laxson identified a "dummy doll" of the victim's size, which the State used as a demonstrative aide. Mr. Laxson drew on the doll with a marker to indicate where the victim was wounded; he specified that the area inside the lines he drew was a "large hole." Mr. Laxson saw Ms. Hicks, who was "very distraught and crying, just very emotional," kneeling beside the victim and stroking his arms and chest. Mr. Laxson was told that Defendant was not on the property.

Mr. Laxson testified that the medical examiner came to the scene. Mr. Laxson identified a photograph of the victim's back that was taken at the local EMS station, which showed a gunshot exit wound to the right side of the spine just below the neck. He noted that the victim was sent to Nashville for autopsy.

On cross-examination, Mr. Laxson testified that, although Ms. Hicks initially did not speak to him, she told him later that day that she was in the bathroom when she heard a gunshot, after which she ran to the living room and saw Defendant holding the victim. Defendant then ran out the back door and laid the victim on the grass, at which point she saw that the victim had been shot.

Deputy Rock testified that, when he and his partner arrived at the scene, he saw EMS about to place a sheet over the victim's body in the grass; he noted that it was one of the worst scenes he had ever worked involving a child. Deputy Rock stated that Ms. Hicks was "almost catatonic."

After speaking to Ms. Hicks and obtaining Defendant's phone number, Deputy Rock called Defendant and persuaded him to return to the house. He stated that Defendant was crying and "very distraught" and that Defendant talked about what happened, although Deputy Rock did not recall what he said. Deputy Rock did not see the shotgun; he noted that Defendant told him during their call that he had thrown it into a body of water.

Deputy Rock testified that, on a previous occasion, he and Investigator Adams spoke to Defendant about needing "to get in contact with Elkton P[olice] D[epartment] to find out what their city ordinance was as far as discharging a firearm and to be more reserved in where he was discharging his firearms." Deputy Rock stated that Defendant had been outside firing a gun at a door leaned against a tree; he opined that it was in an "unsafe direction." He identified the location of the door on a photograph of Defendant's yard. Deputy Rock testified that Defendant had stopped shooting and had put everything away before they arrived. Deputy Rock agreed that he did not observe any reckless behavior or cite or arrest Defendant that day. He stated that they did not charge Defendant or file a report in connection with the incident, which was normal for that "type of incident."

On cross-examination, Deputy Rock testified that Defendant may have stated that the shotgun "had just gone off" accidentally, although he did not know with certainty. When asked whether Ms. Hicks described the shooting as accidental, Deputy Rock responded that he had kept away from Ms. Hicks due to her emotional state. Deputy Rock did not recall talking to Brandon Mitchell at the scene.

GCSO Deputy Morgan Sutton testified that he arrived at the scene at 11:00 a.m. and created a crime scene log, which reflected that Defendant returned to the house at 11:05 a.m. He did not recall Defendant's demeanor. Brandon Mitchell, whom Deputy Sutton described as Defendant's "cousin/coworker," arrived at 11:21 a.m.

Deputy Sutton identified several diagrams he made of the home and yard, as well as an evidence log. He noted that he did not enter the house until they obtained a search warrant. Deputy Sutton stated that the officers recovered a 12-gauge shotgun magazine, a blue shirt, a "projectile wad," and a Winchester shotgun shell. The diagram reflected that the door was 7.83 feet from a large tan easy chair.

Brandon Mitchell testified that he was Defendant's cousin and that he worked for Defendant laying flooring; he noted that, at the time of the shooting, he was staying at Defendant's house most of the time and that he slept on an air mattress in the living room. He stated that the victim sometimes accompanied them to work. He said that, on March 10, 2022, he and Defendant were going to Huntsville for a job and that they went to Defendant's house to pick up some tools.

Mr. Mitchell testified that, three weeks before the shooting, Defendant traded with Mr. Mitchell's brother for the shotgun. Defendant had the shotgun in his van when he had a wreck, and a piece of the shotgun had been lost after the wreck. Mr. Mitchell said that, on March 10, Defendant found the missing piece and told Mr. Mitchell that he was going to fix the shotgun.

Mr. Mitchell testified that he went inside and lay down on the floor in the living room with his head in front of the large tan easy chair in which the victim was sitting. Mr. Mitchell stated that Defendant stood up with his back to Mr. Mitchell and carried the shotgun tucked under his arm in such a manner that the barrel pointed down at Mr. Mitchell's face. Mr. Mitchell told Defendant, "Hey, that's pointing at me." Mr. Mitchell noted that Defendant did not have his finger on the trigger. Mr. Mitchell said that Defendant turned and walked out the door. He initially denied that Defendant said anything to him; however, after refreshing his recollection with his police statement, Mr. Mitchell remembered that Defendant responded, "I would never shoot you."

Mr. Mitchell testified that the shotgun "went off," that Defendant screamed and ran outside with the victim, and that he followed Defendant. He noted that the victim appeared

to be deceased. Mr. Mitchell stated that Ms. Hicks was in her bedroom and that her father, Roger Hicks, was asleep elsewhere in the house.

Mr. Mitchell agreed that he initially told officers that he went to a neighbor's house to call 911. Mr. Mitchell testified that he, in fact, "went and got rid of the drugs [he] had on [him]" before returning to the scene. Mr. Mitchell stated that he used illegal drugs daily at the time but that he had not taken any drugs on the day of the shooting. Mr. Mitchell noted that he had abstained from drug use for fifteen months by the time of trial. Mr. Mitchell testified that Defendant was driving away from the house as he returned to the scene. He said that Defendant returned later in the day and that Defendant and Ms. Hicks were both "hysterical."

Mr. Mitchell described Defendant as "fine" before the shooting. He said initially that he was unaware of Defendant's having taken any medications that day; however, after refreshing his recollection with his police statement, Mr. Mitchell said that he had told officers that Defendant had taken "one or two [K]lonopins." Mr. Mitchell explained that he did not see Defendant take anything but that he knew Defendant had been prescribed "benzos" for a "mental breakdown" related to his recent divorce and other children. Mr. Mitchell stated that Defendant did not use illegal drugs.

Defendant had previously told Mr. Mitchell that the city of Elkton had no ordinance prohibiting him from firing guns on his property. Mr. Mitchell stated that, on one previous occasion, he and Defendant had shot at a door leaning against a tree in Defendant's yard.

Mr. Mitchell testified that Defendant held the shotgun under his right arm with his hand on the stock. He never saw Defendant's hand near the trigger. He agreed that Defendant inadvertently swung the barrel toward him, that he told Defendant that the gun was "in [his] face," and that Defendant playfully stated, "Don't worry, Brandon. I won't shoot you," before turning around. Mr. Mitchell did not know how many steps Defendant took before the gun went off. He did not recall Defendant's ever moving the barrel from a downward position. Mr. Mitchell had no explanation for what made the shotgun fire. He thought Defendant had shot into the wall until Defendant screamed and grabbed the victim. Mr. Mitchell testified that he told the police multiple times that the shooting was accidental. He stated that no question existed in his mind that it was an accident.

On redirect examination, Mr. Mitchell testified that Defendant owned three or four guns and that Defendant knew how to use a handgun. Mr. Mitchell noted that the shotgun was an "AR 12-gauge" and that Defendant had it for only three weeks before the shooting. When asked whether Defendant knew or should have known not to point the barrel at a person, Mr. Mitchell responded, "He wasn't pointing it at anybody. Not intentionally." When asked whether Defendant knew the safe way to carry a gun, Mr. Mitchell said, "I can't say that for sure. I can just say the gun shouldn't have gone off." He agreed, though,

that Defendant knew pointing the barrel at a person could be dangerous. On recross-examination, Mr. Mitchell agreed that hunters were taught to point a gun downward when not firing it so that it would fire into the ground if it went off.

On further redirect examination, Mr. Mitchell agreed that the living room was small and that he and Defendant had a "good idea" of where everyone in the room was located. Mr. Mitchell denied hearing the victim get up; he recalled that Defendant picked up the victim from "[s]omewhere on the chair." When asked whether the victim slipped up behind Defendant, Mr. Mitchell stated, "I'm not aware of where he was at in any of it honestly." Mr. Mitchell reiterated, though, that the victim was shot "in the chair."

Former GCSO Lieutenant Shane Hunter testified that he coordinated the scene on March 10, 2022. Lieutenant Hunter stated that the officers found a spent shotgun shell casing on the air mattress in the living room, which was located behind the tan easy chair.

Lieutenant Hunter testified that he used a laser measuring device to calculate the distances noted on Deputy Sutton's diagrams. He directed GCSO Investigator Josh Bass to interview Defendant at the police station once Defendant returned to the property. Lieutenant Hunter stated that the shotgun was recovered and that he sent it to the Tennessee Bureau of Investigation ("TBI") for testing.

On cross-examination, Lieutenant Hunter agreed that everyone present in the house that day told him that it was accidental. Lieutenant Hunter denied that he had ever experienced a gun's accidentally firing. On redirect examination, Lieutenant Hunter agreed that he had never seen a gun "go off just randomly without some sort of user negligence or recklessness."

TBI Special Agent Denver Hall, an expert in firearms forensics, testified that he examined Defendant's "semiautomatic AR-15 style shotgun" and found it to be in normal operating condition with a functional safety feature. He stated that the magazine fit the shotgun and functioned normally. He did not test three 12-gauge shotgun shells that came with the gun and magazine.

Agent Hall testified that the shotgun was forty inches in overall length and that the barrel's condition was good, meaning that it had no obstructions, bulges, or cracks. He noted that the shotgun held five rounds in the magazine and one in the chamber. Agent Hall stated that, when the magazine was inserted into the shotgun, the "bolt [had] to be set forward in order to chamber the shot shell." After that, the shotgun would be ready to fire once the safety was switched to the off position. He noted that he would assume the shotgun was loaded if he saw that the magazine was inserted and the bolt was forward. Agent Hall stated that, if he was unsure if the shotgun was loaded, he would pull the bolt back and visually inspect the chamber.

Agent Hall test-fired the shotgun using "Leo brand two and three-quarter inch one ounce of eight shot and Remington three-inch buckshot." The three-inch shells fired, but the casings did not eject from the shotgun. Agent Hall continued, "The ejection pattern for the two and three-quarter inch shot shells was about 10 feet at 2:00." Agent Hall gestured to indicate the direction to which he referred when he said 2:00.

Agent Hall testified that he disassembled the shotgun and examined its internal components. He did not see any "abnormal wear on the hammer or disconnect." Agent Hall stated that he "also bumped the shotgun on the ground by holding the barrel and bumping the butt stock on the ground to see if the hammer might fall with the shotgun" and "took a small armor[er]'s hammer and hit the gun in multiple areas to see if that would also cause it to misfire." Agent Hall was unable to make the shotgun fire accidentally.

When asked whether the shotgun was able to be fired "under circumstances where you would possibly not intend for it to fire," Agent Hall responded, "Yes. And those scenarios as you see documented there . . . still require the trigger to be pulled for that to happen." He stated that, generally, a gun would not fire without the trigger's being pulled unless "something has been altered with the firearm that would cause it to do so." Agent Hall did not note any such alterations to the shotgun.

Agent Hall's report stated, "The only notable thing that was observed was that when the safety selector was even slightly off the 'Safe' position, the trigger could still be pulled and the hammer would fall." Agent Hall noted that, in that specific situation, the trigger required eleven and a half pounds of pressure to be pulled; he noted that the normal amount of pressure required to pull the trigger on that type of shotgun was eight and a half pounds. Agent Hall demonstrated the action for the jury and noted, "That requires a lot of force to hold that trigger. It's actively trying to push my finger forward with the trigger, but that hammer does fall whenever I do that[.]" Agent Hall stated that he would not characterize the situation as a normal firing scenario because he was attempting to "make the gun malfunction" by forcing it to shoot. Agent Hall opined that shooting the shotgun under this specific circumstance "would not happen if you were handling it in a safe manner." Agent Hall testified that he verified that the parts of the shotgun's safety mechanism were present. The shotgun had no missing or "after-market" parts.

Agent Hall testified that he underwent gun safety training with the Tennessee Wildlife Resources Agency and that the four main rules of gun safety were to treat all firearms as though they are loaded; never point the firearm at something he did not wish to destroy; keep his finger off the trigger until he was ready to fire; and know his target and what was beyond it.

Agent Hall testified that he contacted the shotgun's manufacturer, Silver Eagle, to check if the shotgun was subject to any recalls. A Silver Eagle representative informed

Agent Hall that they did not sell "fire control groups," meaning the part inside the receiver that includes "the hammer, the safety, and the disconnector." The representative also told him that they were unaware of any compatible after-market fire control groups and that no recalls were active. Agent Hall stated that he found dead leaves inside the receiver but that they would not have affected the shotgun's operation.

Agent Hall testified that the representative provided him with the owner's manual for the shotgun, which included numerous safety warnings in addition to the four main rules of gun safety. Agent Hall read from the owner's manual, "This firearm has the capability of taking your life or the life of someone else. Always be extremely careful with your firearm. An accident is almost always the result of not following basic firearm safety rules."

On cross-examination, Agent Hall demonstrated a "slap technique" in which, when the magazine was inserted and the bolt locked to the rear, a button was "hit in order to release the bolt." He acknowledged that hitting the button did not require him to pull the trigger. Agent Hall said that it was possible to hit the button by putting it under one's arm. He added, though, that hitting the button "could send the bolt forward, and then at that point the trigger would have to be pulled to fire." Agent Hall reiterated that, even if the bolt came forward, the safety would have to be off and the trigger pulled for the shotgun to fire.

Agent Hall testified that he test-fired the shotgun a minimum of five times. He acknowledged that the TBI laboratory was a controlled environment, unlike a home. Agent Hall said that the shotgun did not eject any of the three-inch shells; he maintained that the shotgun was operating normally. He stated that, based upon his experience and training, the fact that the shotgun fired when "the safety is not completely in the on position" and the trigger was pulled did not constitute abnormal operation. Agent Hall stated that, when he tested the shotgun's ability to fire with the safety slightly disengaged, he did not use live ammunition because "the gun could discharge."

Agent Hall testified that he had examined "[h]undreds if not thousands" of firearms and that some of them accidentally discharged. He defined accidental discharge as "due to the gun itself malfunctioning," whereas negligent discharge "would be due to the operator of the gun being negligent in handling the gun." When asked whether it was possible Defendant's shotgun accidentally discharged, Agent Hall stated that his examination reflected the shotgun was operating normally. He noted, "That's not to say that it could never have any problems, but I could not determine any issues with the shotgun." Agent Hall acknowledged that he was not present during the shooting and that the people present were probably in a better position to describe what happened.

Agent Hall testified that he did not examine the magazine beyond determining whether it functioned correctly inside the shotgun. He stated that he did not typically disassemble magazines and that the magazine appeared to be "normal." Agent Hall maintained that, in spite of the three-inch shells' not ejecting, the magazine was operating normally.

On redirect examination, Agent Hall testified that the three-inch shells' failure to eject could be attributed to the shotgun's "gas powered" operating system or the particular ammunition Agent Hall used. He stated that a retained shell casing would not make the shotgun fire on its own. He noted that the shotgun functioned properly with two and three-quarter-inch shells and that he did not continue to shoot the three-inch shells after determining that the shell casing did not eject. He stated that the shotgun was "chambered" for three-inch shells and that "it just had problems completely ejecting the shot shells."

Agent Hall identified three shotgun shells recovered by Investigator Adams at the scene. Two of them were two and three-quarter-inch shells and the third was a three-inch shell. He also identified the spent shell recovered from the air mattress as a two and three-quarter-inch shell.

On recross examination, Agent Hall testified that a firearm's not ejecting a shell could be caused by factors such as the ammunition, the person holding the firearm, and the magazine. He maintained that Defendant's shotgun would not fire unless the trigger was pulled. He said that, after the first shot, the shotgun "could potentially jam" if the shell did not eject. Agent Hall agreed that a firearm could jam and still be considered in normal operating condition.

Davidson County Deputy Chief Medical Examiner Dr. Erin Carney, an expert in forensic pathology, testified that she performed the victim's autopsy. Dr. Carney stated that the slug struck the victim's face beginning at the nose before traveling downward along the mouth and neck, striking teeth and the jawbone. She noted that the edges of the wound were "ragged" and that there was a "big gaping hole" in the victim's face. Dr. Carney identified the victim's x-rays, which reflected that part of the jaw was missing.

Dr. Carney testified that the "slug" did not "enter until down lower in the neck. That's where the pieces actually go in and spread out and cause damage to the tissue." Dr. Carney said that the slug broke into pieces, one of which exited the victim's back. She stated that other pieces of the slug came to rest in the victim's back and right chest, as well as "along the wound path." Dr. Carney noted that she found "a piece of cork that had been in the shot cup that traveled into the wound and went out his neck." She stated that the victim also had abrasions to the left eyebrow, cheek, and between the eyes, which she hypothesized were caused "from where the filler impacted his face."

Dr. Carney testified that, based upon the abrasions on the victim and the cork filler's being present in the victim's neck, the shot was fired from "within a few feet." Dr. Carney determined that the cause of death was a shotgun wound to the head and neck and that the manner of death was homicide. She noted that "there's really only a couple of options" when determining the manner of death for gunshot wounds, which were based upon "whose hand is on the trigger" or whether the gun misfired "on its own." Dr. Carney stated that she spoke to Agent Hall and that he informed her that Defendant's shotgun would not fire without pulling the trigger.

On cross-examination, Dr. Carney testified that, although she spoke to law enforcement about the scene of the shooting, she did not speak to anyone who was present when the shooting occurred. She agreed that she relied upon the information law enforcement provided when composing her report. Dr. Carney noted that she generally could not "go talk to people other than what law enforcement was doing." She stated that, although eyewitnesses saw the shooting, they did not "have the knowledge to test a gun and know if it's working properly[.]" Dr. Carney said that she did not determine whether an event was accidental, reckless, or intentional. She clarified that her conclusion that the manner of death was homicide did not mean that it was intentional. Dr. Carney stated that, for her purposes, the victim's death did not qualify as an accident. She declined to opine whether her conclusion was based upon direct or circumstantial evidence, noting that it involved a legal determination. On redirect examination, Dr. Carney agreed that law enforcement provided her with Defendant's police statement.

Investigator Bass testified that he interviewed Defendant on March 10, 2022, at the police station. The recording of Defendant's police interview was played for the jury and received as an exhibit. Defendant was upset and crying throughout the interview. After being read his rights, Defendant told the officers that he was not regularly taking any medications and that he did not drink alcohol. He stated that he sometimes used marijuana. Defendant denied having taken anything that day. Defendant said that he had previously had a "mental breakdown" when he "lost [his] other two kids" and that he had gone to the hospital but left because the hospital did not help him.

Defendant recounted that, earlier that morning, he woke up and got the victim ready to go to work with him. He stated that they left the house and picked up Mr. Mitchell before getting the victim breakfast. Defendant said that their scheduled job was canceled and that he was assigned another job. He stated that they returned to his house to retrieve additional tools.

Defendant said that he lifted up a compressor hose in his truck and found pieces for his shotgun. He noted that he had wrecked his van and that the "spring and the button came out" from the "magazine release catch." Defendant had been searching for the pieces for two weeks. Defendant stated that he repaired the gun while sitting on the living room floor

and that, when he "got it to where it would work," he told Mr. Mitchell that he was going outside to fire it. Defendant recounted,

> After it worked, I told [Mr. Mitchell] I was going to walk outside and shoot it. And I [stuck] it under my arm, and walk[ed] out, and . . . I've never left a damn bullet in there. Like we, we cleared it out, and then whenever I put that clip in there, it's got a . . . slap stick reload on it. And that's the only thing I can think of, maybe, maybe it chambered it, and I don't know how that came, like, cause I had the gun under my arm. And I don't know how the trigger went off, and my baby was sitting in the chair behind me, and I was walking out the . . . door, the chair is right there, and then, that's it. I freaked out, and I grabbed him, and I took him . . . outside. And there [was] nothing I could do.

Defendant said that he had taken about three steps toward the door when the shotgun fired. Defendant stated that Mr. Mitchell was either in front of or behind the couch at the time. Defendant stated that he "took off" with the shotgun intending to kill himself but that Ms. Hicks called him and told him that she needed him to come back. Defendant stated that he left the shotgun beside a creek; although he did not know where the creek was located on a map, he said that he would take officers to it. Defendant said that he never wanted to see the shotgun again. He agreed that the magazine in the shotgun was the same one that he had given the officers.

Defendant drew a diagram of the living room and noted that he sat on the living room rug to work on the gun in case the spring came out. He said that he also worked on the gun on the kitchen counter. Defendant agreed that he had the shotgun pointing behind him when it fired. He noted, "I took a hunter safety course, I know . . . I should've had it pointed in front of me at the ground, but I . . . wasn't thinking." Defendant agreed that he was in a hurry and that he was "excited" to shoot the shotgun. Defendant stated, "I just ruined my life. That little boy is all I got."

Investigator Bass testified that he was familiar with the slap technique, which he described as, "If the chamber was locked back in position and magazine loaded in the magazine well and the slap on the side was depressed, it would chamber a round." Investigator Bass testified consistently with other witnesses about the rules of firearm safety. He added that a rule was to "always know your target and what's in front of you and behind."

Investigator Bass testified that he attempted unsuccessfully to find the creek where Defendant said he threw away the shotgun but that Defendant gave him the shotgun on March 15, 2022, when Investigator Bass visited him at home. Investigator Bass identified

- 14 -

an audio recording he made of the encounter with Defendant; he noted that Defendant was getting ready to leave for work at the time.

In the recording, Investigator Bass told Defendant that he had not found the shotgun and asked if Defendant had retrieved it. Defendant responded affirmatively and stated that he had spoken to an attorney, who told him that he did not have to give the police the shotgun. Investigator Bass responded that he had also spoken to the attorney before contacting Defendant and that the attorney said he had not yet been retained. Defendant asked why Investigator Bass needed the shotgun, and he responded that he wanted to make sure no one else was hurt by it and that he was collecting evidence of a homicide. Defendant stated that the shooting was an accident, and Investigator Bass agreed and clarified that a homicide was anytime a person's death was caused by another person, regardless of whether it was accidental.

Defendant said that he thought it was best for him to retain the attorney later that day as planned and "let [him] deal with y'all." Defendant apologized for becoming agitated, and Investigator Bass said that he understood. Defendant reiterated that he left with the shotgun intending to commit suicide and that he did not anticipate returning to speak to the police.

Defendant stated that, if the police took the shotgun, he would be "out a lot of money." Investigator Bass said that his collecting the shotgun did not mean that Defendant would not get it back. Investigator Bass stated that Defendant was legally able to own firearms, that he would give Defendant a property receipt and that, if Defendant wanted the shotgun, it would be returned to him at the end of the investigation. Defendant stated that he was not going to "deal with" the attorney anymore. Defendant and Investigator Bass's subsequent statements indicated that Defendant retrieved the shotgun and gave it to Investigator Bass.

On cross-examination, Investigator Bass testified that he interviewed Defendant around 12:50 p.m. on March 10, 2022, and that the incident occurred around 10:00 a.m. He stated that Defendant came to the police station voluntarily. Investigator Bass said that Defendant told him several times during the course of the interview that the shooting was an accident. Investigator Bass stated that, at the scene, Defendant voluntarily turned over the shirt he had been wearing.

Investigator Bass did not suspect Defendant to be under the influence of any drugs; he noted that Mr. Mitchell had told him that Defendant had taken prescribed Klonopin. He acknowledged that Defendant denied having taken any medication that day. Investigator Bass did not ask Defendant for a blood sample, and he agreed that he could have obtained a search warrant if Defendant had refused consent.

At the close of the State's evidence, Defendant called Ms. Hicks as a witness. Ms. Hicks testified that, on March 10, 2022, she woke up and got the victim dressed to go to work with Defendant. She noted that she worked at a daycare and that the victim was there most days but that Defendant had begun taking the victim to work often. Defendant and the victim left around 7:00 a.m.

Ms. Hicks went back to sleep after they left and was on the couch around 9:30 or 10:00 a.m. when Defendant returned to get his tools for another job. She stated that the victim told her about getting a lollipop and that she went to the bathroom, which was very close to the living room, to brush her teeth. Ms. Hicks noted that her father was asleep in the bedroom. Ms. Hicks did not hear any conversation between Defendant and Mr. Mitchell.

Ms. Hicks testified that, as she came out of the bathroom, she heard a gunshot, and Defendant screamed. She stated that she was "right behind" Defendant as he grabbed the victim and went outside; she could see that the victim was deceased. Ms. Hicks said that she stayed with the victim in the yard; she recalled grabbing a phone, but she did not know who called 911. Ms. Hicks stated that Defendant "tried to get [her] to hold the phone and said he couldn't do this, and [she] immediately knew what he meant[.]" Ms. Hicks told the dispatcher that Defendant was going to kill himself. She agreed that she was also "begging for help." Ms. Hicks stated that the ambulance arrived after Defendant drove away. Although she did not know how long Defendant was gone, she said it might have been thirty minutes.

Ms. Hicks testified that Defendant kept his guns outside in his van in a locked box requiring a key. Ms. Hicks denied that she had ever seen Defendant do something reckless with a gun or take drugs. Ms. Hicks agreed that she told the dispatcher and the police that the shooting was an accident. She affirmed that she and Defendant married after the incident, as they had planned. Ms. Hicks stated that the victim was her only child and that he was named after Defendant.

Upon this evidence, the jury convicted Defendant of the lesser-included offense of reckless endangerment with a deadly weapon. After a sentencing hearing, the trial court ordered a two-year sentence suspended to supervised probation.

Thereafter, Defendant filed a timely motion for new trial, in which Defendant argued that the trial court erred by admitting evidence of the December 2021 incident and that the evidence was insufficient to support his conviction. The State's response included that the December 2021 incident was "relevant as . . . evidence to demonstrate [D]efendant's mens rea" and that it was not admitted as propensity evidence. The State also argued that the evidence was sufficient, opining that "there was jury nullification in this matter, and there was more than enough to find reckless homicide."

At the motion for new trial hearing, Defendant argued that the December 2021 incident should not have been admitted because of its temporal proximity to the shooting in this case; that it did not tend to prove any material issue because the State conceded that the shooting was accidental; and that, specific to Rule 404(b), it did not rebut an inference that the shooting was an accident or mistake. Defendant averred that the December 2021 incident "likely swayed" the jury to convict Defendant of the last lesser-included offense rather than acquitting him altogether.

The State initially noted that the trial court had limited the scope of questioning such that only Defendant's awareness of gun safety could be discussed. The State continued that, if the trial court found that the incident was a prior bad act, it was admissible because its purpose was to show that Defendant had been advised three months before the shooting that "knowing what direction you're pointing is important[.]" The State reiterated that the incident bore on Defendant's reckless mental state and whether it was "willful and wanton disregard if [he] had been advised it is important to know what is in front of [him] or behind [him] wherever [his] barrel is pointed."

During later argument, however, the State asserted for the first time, "[T]his was not a prior bad act in which [Rule 404(b)] would apply . . . . [because] the officers' testimony [was] only that they didn't cite him, didn't arrest him, didn't observe anything improper." The State noted that the officers had merely "advised [Defendant] that he should potentially be careful about where he was shooting. The direction in which he was shooting."

At the conclusion of the hearing, the trial court found that the evidence was sufficient to support Defendant's conviction. The court discussed Defendant's having pointed a loaded shotgun first at Mr. Mitchell, then at the victim, as well as Agent Hall's testimony "that the weapon in question would require [eleven] pounds of trigger pull, and there wasn't another manner for the gun to be able to go off as it did[.]" The court noted that no proof had been presented that the environment in Defendant's house differed from the TBI laboratory to a degree to "cause a weapon to go off" without pulling the trigger.

The trial court noted that "the uniqueness to this particular case is the reckless endangerment with a deadly weapon, the requirements are really no different than that of reckless homicide except one requires a death" and that "the jury chose to acquit [Defendant] of each of the homicide related offenses before ultimately convicting him of reckless endangerment with a deadly weapon." The court reiterated that it "in no way thinks that this was any sort of intentional act on [Defendant's] behalf. It was, in fact, an accident . . . based on the reckless possession of a weapon that ultimately caused a horrific result."

The trial court found that the December 2021 incident was "not, in fact, other crimes, wrongs or acts." The court noted that having a firearm was a citizen's right and

- 17 -

stated that "the fact that [Defendant] was shooting outside his residence three months before, the [c]ourt does not find that to be [an] other crime, wrong or act." The court recalled that it had excluded the reason for the officers' visit as hearsay and that the officers had testified that they "just went to merely advise of safety precautions in regard[] to shooting, and that can be done out of the kindness of someone's heart that hopefully everybody shares with one another safety protocols in that particular instance." The court noted that Defendant had cross-examined the officers and elicited testimony that no laws had been broken and that the officers had not cited or arrested Defendant. The court continued,

> I guess if a reviewing court did somehow find that to be a crime, wrong or act, the [c]ourt would go a step further in saying that at least the [c]ourt's determination was that that was not submitted to prove the character of [Defendant]. That he had a character for doing reckless things as the [c]ourt did not find that act to be reckless in that particular regard.

The trial court denied the motion for new trial, and Defendant timely appealed.

## II. Analysis

### A. Prior Acts Evidence

Defendant contends that the trial court erred by admitting the December 2021 incident under Tennessee Rule of Evidence 404(b). The State responds that the trial court did not abuse its discretion and that any error was harmless.

Defendant correctly notes in his brief that, at the motion for new trial hearing, the State changed its position and argued that the December 2021 incident was not a "crime, wrong, or act" falling under Rule 404(b). Rather, the State argued, it was general evidence subject to Rules 401 and 403 governing relevance and the balancing test for probative value versus the risk of unfair prejudice; the trial court agreed that the December 2021 incident was not the type of act contemplated by Rule 404(b) because Defendant had a right to shoot a gun in his yard. Even so, we conclude that the evidence was properly admitted pursuant to Rule 404(b), which involves a more stringent standard of admissibility than Rules 401 and 403. *See, e.g.*, *State v. Combs*, No. E2000-02801-CCA-R3-CD, 2002 WL 31118329, at *49 (Tenn. Crim. App. Sept. 25, 2002) (noting that Rule 404(b)'s requirement that the evidence be excluded if the danger of unfair prejudice outweighs its probative value is "more restrictive that the balancing test established for relevancy in Rule 403.") .

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

Here, the trial court complied with the procedural requirements of Rule 404(b) by holding a jury-out hearing. The trial court found that the State proved the prior act by clear and convincing evidence, that the incident was relevant to a material issue other than propensity, and that the probative value outweighed the risk of unfair prejudice. Thus, we will review the trial court's decision for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652); *Baker*, 785 S.W.2d at 134.

The trial court agreed with the State that the incident was probative of Defendant's mens rea, specifically, his knowledge of firearm safety in the weeks leading up to the shooting. Defendant's recklessness or lack thereof was the only issue in dispute in this case. We note that the court carefully considered the risk of unfair prejudice, excluded the hearsay evidence of the complaining business's statements to the police, and limited the evidence to the officers' having discussed safe firing practices with Defendant. The trial court did not abuse its discretion in admitting the December 2021 incident.

We also note that the jury was instructed that the incident was not to be considered as propensity evidence but only as evidence of Defendant's knowledge of the risks of firearms on the day of the shooting. The jury is presumed to follow the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022). Defendant is not entitled to relief on this basis.

## B. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to support his conviction for reckless endangerment, arguing that the State did not establish his reckless mental state. Defendant argues that his conduct was not a gross deviation from the standard of care; specifically, he avers that he was pointing the shotgun downward, as he had been taught in his hunter safety course, when the shotgun went off. Defendant states that he did not consciously disregard a risk because he was unaware that the gun was pointing at the victim. Defendant notes that he "simply adjusted the gun from facing down at the ground in [Mr. Mitchell]'s direction to under his arm facing backward before taking a couple of steps out the door." He also states, however, that "the evidence does not indicate that [Defendant] had an opportunity to change the position that he was handling the gun before" it went off "just moments later." Defendant argues that his statement to the police that he knew he should have pointed the shotgun's barrel in front of him was "a statement with the benefit of hindsight from a grieving father who was trying to make sense of his son's tragic death" rather than an admission of reckless conduct.[3] The State responds that the evidence is sufficient to support Defendant's conviction.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the

---

[3] Defendant does not contest the sufficiency of the evidence for the other elements of the offense.

conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). When committed with a deadly weapon, such as a firearm, reckless endangerment is a Class E felony. Tenn. Code Ann. §§ 39-13-103(b); 39-11-106(a)(6)(A).

The "reckless" mens rea refers to:

a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).

When viewed in the light most favorable to the State, the evidence presented at trial was sufficient to establish that Defendant was aware of, but consciously disregarded, the substantial and unjustifiable risk that his pointing a loaded shotgun behind him where the victim was sitting and pulling the trigger could result in the victim's death. The law enforcement witnesses and Agent Hall all recited that two main rules of firearm safety were not to point the barrel of a gun at something that the user does not want to shoot and to treat every gun as though it is loaded. Defendant stated in his police interview that he had taken a hunting safety course and that he knew he should have pointed the shotgun at the ground in front of him, not behind him. Defendant said that he had been working on the shotgun on the living room floor as the victim sat in a chair watching television, that he installed the magazine into the shotgun, and that he was hurrying to take it outside. Mr. Mitchell testified that he was lying on the floor when Defendant stood, turned around, and swept the shotgun's barrel in front of his face. When Mr. Mitchell alerted Defendant to

- 21 -

this fact, Defendant responded by saying, "Don't worry, I'm not going to shoot you." Defendant's response clearly evinced an understanding of Mr. Mitchell's concern and, by extension, the underlying principle that it was dangerous to point a loaded gun at another person. In addition, Mr. Mitchell's head was immediately in front of the chair in which the victim was sitting, and his statement alerted Defendant to the fact that the barrel was pointing in the same direction as the victim. Instead of pointing the barrel in front of him, as he had been taught to do, Defendant chose to continue walking away with the barrel pointed behind him. We note that the victim was sitting in an adult-sized easy chair and that the gunshot struck him in the face and throat with a slightly downward trajectory; thus, it was apparent that the shotgun was not pointing at the floor when it fired.

Relative to Defendant's contention that the evidence weighed toward a finding that he did not pull the trigger, the jury heard Mr. Mitchell's testimony, echoed by Defendant's police statement, that Defendant did not have his hand on the shotgun's trigger when it fired. The jury also heard Agent Hall's assessment that the shotgun could not be made to fire without pulling the trigger, even if a shell had inadvertently been chambered using the slap technique. Defendant cross-examined Agent Hall extensively about the limitations of his analysis in the controlled environment of the TBI laboratory. By its verdict, the jury credited Agent Hall's testimony over Mr. Mitchell's testimony and Defendant's statement to the contrary, and we will not disturb the jury's factual findings, credibility determinations, or the weight it gave the evidence. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this basis.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE